April 6, 2009

07-CR-00410-CERT

_FILED ____ENTERED
_LODGED____RECEIVED

JUN 2 5 2009   DJ

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT O; WASHINGTON
DEPUTY

To: US Attorney's Office
Attn: James Lord & Robert Kondrat

From: Beverlee Kamerling

Re: Defendant's Conduct and the "Policing" of Client's Company Activities
of Proposed Alleged Securities Fraud

Note: In going through the materials that have been mailed to me to date by the public defender's office, I have a file on SIPP Industries, Inc. and the FBI investigation of that company. I have requested that Peter Avenia's office forward me all of their disclosure statements from my computer so that I can remember the names of the parties for a memorandum. As of this date, I do not have the disclosure file and cannot insert the parties' names. In that event, I will list as "NTBP" for name to be provided.

Further, I am submitting a "broadbrush" summation of the activities as I do not have any documents for reference. Once those documents are received, I will update this Overview of Activities. This investigation of SIPP brought to mind all of the other companies whereby I have acted as "policeman" and "whistle blower" pursuant to proposed alleged violations of securities rules and regulations. Enclosed please find a summary of the activity on three of such companies.

## SIPP INDUSTRIES, INC.
### Overview of Activities

In reading over the materials collected by Agent Quinn of the FBI, I find that there are several significant errors and the "re-directing of blame" in my direction as it is a convenient way to cover the wrongdoing of those parties. I believed that Roger NTBP and Kelli Austin and other were trying to suppress their egregious alleged securities violations which were discovered by myself and reported to the company's board of directors by myself, prior to any completion of financial statements.

SIPP International Industries, Inc. was a company that was brokered by my office, purchased from a securities lawyer in California, with debt being converted from fees owed to that attorney over 2 years ago, etc. The corporate vehicle was a "pristine company". The public company became known as Sipp International Industries, Inc. (the proposed "parent"), a Nevada corporation publicly traded and the proposed parent that was postured to acquired an operating company, Sipp, Inc., a Nevada corporation, as a wholly owned subsidiary. In the process of obtaining the documents to assist in the acquisition of the proposed wholly owned subsidiary,

Sipp Industries, Inc. ("sub"), a Nevada corporation, I became very alarmed that the proposed subsidiary, Sipp, Inc., had an audited $8.5 million dollar balance sheet. As in any acquisition of two corporations, two independent auditors have to be retained, one for each corporation, the parent and the proposed subsidiary. I referred Stan Lee, CPA of Southern California, the existing auditor of the public vehicle, and Madsen & Company, CPA's, Inc. as the auditor for the sub. Lee Dana was President of the "public" parent and I cannot remember who was the President of the subsidiary as I do not have access to my files.

By being very alarmed at this large amount ($8.5 million) to be merged onto the public company's balance sheet, I started challenging the amounts submitted on the sub's audited financial statements. These challenges were not well accepted by Kelli Austin or Roger NTBP. I challenged the method by which the sub's current account or auditor, Kelli Austin's father arrived at these figures. I also questioned Arthur DeJoya, CPA, board member extensively as to how whether he reviewed the audit file and concurred with the amounts reflected on the sub's balance sheets, etc. Every member of management of the sub was hostile to my questioning or their financial statements. This hostility made me suspicious and I began making anonymous calls to the subs' equipment locations and packagers. I discovered that the expensive equipment reflected as an assets on the audited balance sheet was not owned by the sub, the inventory was not owned by the sub, the sales were not owned by the sub, nor were any other posted assets. When I alerted Lee Dana, President of the public parent and the board of directors, the board berated me considerably and I told them that at least 1 of them, Arthur DeJoya, was a CPA and had his license to protect. I warned them all about publishing false financial statements. Additionally, I told them that the 2 new auditors would not accept their fraudulent financial statement on the face of it and that the auditors would conduct their own, independent investigation as to the $8.5 million in assets. I abruptly told all involved on a conference call that the sub, Sipp, Inc's audited financial statements were fraudulent and the financial information could not and would not be part of the merger and that our office would not be involved.

It was later discovered that Roger NTBP coerced the owners of the packaging plant and equipment owners to confirm that the sub was the owner of the equipment, inventory, etc. The accountant and/or auditor was the father of Kelly Austin, the person and partner of Roger NTBP. who tried to re-direct their alleged securities violations with the FBI to me. Kelly Austin told the FBI that she was glad that I was in jail, etc. I am not the one who should be incarcerated.

Additionally, further to the fabrication of assets, Roger NTBP and Kelli Austin opened an illegal bank account under the parent's name (names are similar), placed themselves as officers and directors of that parent company and sold shares (presumably in the public parent) to several police personnel employed by the Las Vegas Police Department. Neither Roger NTBP nor Kelli were officers of directors of the parent company and had no authority to conduct any business on behalf of the parent. Roger NTBP and Kelli Austin still had authority to act on behalf of the sub prior to the merger, but not the parent, ever. This event was discovered by the share purchasers when Roger NTBP couldn't deliver shares that the purchasers thought to be issued by the parent. Roger NTBP and Kelli Austin could have issued shares from the sub. Both Roger and Kelly Austin used the funds derived from the illegal sale of securities, deposited illegally into the new bank account as their own "personal bank account", including gas purchase, clothing, sundries and grocery purchases.

I later learned that Roger NTBP was a former building contractor in California who had a number of complaints of non completion of paid contracted construction work and left California and settled in Nevada. Roger NTBP has also placed all of his assets into the accounts owned by his wife. Once I obtain the disclosure statements, I will have the legal names and activities of all the players. I will then be able to expand upon the above, augment the activities once I can remember the sequence of events and persons, etc.

THE POINT IS THAT I WAS THE ONE PERSON WHO TRIED TO STOP ANY POTENTIAL SECURITIES FRAUD ON SHARE PURCHASES AND OTHER CORPORATE ACTIVITIES. THE US ATTORNEY'S OFFICE SHOULD BE AWARE OF THIS AND OTHER ACTIVITIES WHERE I WAS INSTRUMENTAL IN THE HALTING OF ANY PROPOSED FRAUD TO THE PUBLIC. EVERYTHING THAT WAS COMPLETED BY OUR OFFICE WAS PURSUANT TO CORPORATE AND SECURITIES RULES & REGULATIONS.

### FUSION FILMS INTERNATIONAL, INC.
### Overview of Activities

Another instance of potential alleged securities fraud is with Fusion Filmworks International, Inc., a company that was a client of our office. That management wanted to include an $11,000,000 cash deposit on their "prepared by management" financial statements. Again, I was alerted and questioned the source of such a deposit. I discovered that one of the investors in an unrelated film project was willing to open an account in Switzerland, under the name of Fusion Filmworks International, Inc., whereby the investor would have sole signing power over the account so there was no risk and no real investment into the company. I rapidly contacted all of the other board members and told all of them to dismiss that idea and wouldn't be any part to that fraud. How could one justify those funds getting onto the company's balance sheet? It would either have been a legitimate loan or a legitimate share purchase to be able to own those funds. That company dismissed me (as being "unworthy" to deal with them) when I was arrested and I have no further information.

### GOLDTECH MINING CORPORATION
### Overview of Activities

Goldtech Mining Corporation ("Goldtech") was originally a company designated to acquire gold properties in British Columbia from Morgan Stewart, a mining engineer and surveyor who had "cherry-picked" properties throughout his 50 years in the mining industry. Six months after 3 mining properties were vended into the company, Tracy Kroeker ("Kroeker") was referred to Tolan Furusho and myself as a suitable president for Goldtech. Kroeker falsified credentials, etc. Both Tolan Furusho and I notified Kroeker, then President of Goldtech, that she was in violation of securities laws pursuant to the issuance Goldtech's S-8 free-trading securities, exempt from registration. Tolan Furusho was an officer and director of Goldtech and I was working with the company and the company's auditors. In fact, I located the corporate vehicle and performed the

work on the company, with no compensation to date. The restricted shares that were to be mine were unilaterally canceled by Kroeker. Kroeker committed egregious securities violations by the issuance of free trading shares to her nominees. Those nominees signed stock powers and delivered the certificates to Kroeker (over 1,000,000 shares). Kroeker took the "signed off" certificates to New York and sold the subject shares to investors at a discount to the market price and kept the proceeds from the sale of those certificates, while she is President and Board Chairman.

When Furusho and I learned of Kroeker's securities activities, Furusho placed a "stop transfer" on the subject shares, gave notification to all appropriate parties and demanded the subject shares be returned and canceled. With the help of Hank Vanderkam, attorney in Houston, Texas, Vanderkam suggested that Kroeker ignore the stop transfer and demands by Furusho and recommended and caused Kroeker to change transfer agents from National Stock Transfer, Inc. who held the "stop transfer" documents, to OTC Stock Transfer, Inc. ("OTC")of Salt Lake City, Utah, business associates of Vanderkam. The stop transfers were never honored by OTC. Kroeker negotiated her shares and kept all funds, with the knowledge and consent of Vanderkam and his client & officer Ralph NTBP. When even OTC, the most liberal of all transfer agents, would not allow Kroeker to continue with her transfer activities, Kroeker became her own transfer agent by keeping all of the transfer books and records in her residence outside of Edmonton, Alberta. Kroeker then allowed Ralph NTBP the former President of Goldtech Mining Corporation and President of the Goldtech subsidiary, Egan Systems, Inc., to sell the subsidiary to Ralph NTBP, personally for $1.00 and issued Ralph NTBP 1,000,000 shares of common stock for his services. Egan Systems, Inc. (income over $500K annually, mostly profit) was the only income producing asset owned by Goldtech and was sold without consent of the shareholders.

Tolan Furusho and I believed that there were considerable and obvious securities violations and we organized a lawsuit by referring a number of shareholders to file a lawsuit, on behalf of the shareholders. James Vandeberg and Thomas Puzzo, Attorneys at Law of the Otto Law Group, Seattle, Washington, represented the shareholders in their action against Kroeker, Ralph et. al. Their lawsuit and filings were under the "Goldtech Mining Corporation Shareholders Protection Committee". Kroeker, Ralph NTBP, Vanderkam and the SEC ignored substantial unlawful activities and Kroeker, Ralph NTBP, Vanderkam, et. al. and subsequently Kroeker sold the Goldtech public vehicle to the Chinese Waste Management company for another million dollars. All of that information may be accessed by way of the EDGAR filings on www.SEC.gov. Thomas Puzzo, securities attorney has intimate knowledge of the transaction and I plan to call Mr. Puzzo as a witness in my defense. Mr. Puzzo's father is also a noted attorney and former naval officer, presently practicing as a federal arbitrator. Another witness for my defense is an investor, Keith Robertson, whom I met through this business transaction. FBI Agent Quinn interviewed Keith Robertson and I believe that Agent Quinn did not report any of the above exculpatory information to the US Attorney's Office in the course of his investigation.

I BELIEVE THAT THE US ATTORNEY'S OFFICE SHOULD BE AWARE OF MY ETHICAL WORK POLICIES. Elizabeth Albright will be called to testify as to the day-to-day activity.

April 13, 2009

```
_____FILED    _____ENTERED
_____LODGED_____RECEIVED

       JUN 2 5 2009      DJ
              AT SEATTLE
        CLERK U.S. DISTRICT COURT
     WESTERN DISTRICT O. WASHINGTON
                                DEPUTY
```

Via Telefax (206) 553-0882 - no original to follow

To:     US Attorney's Office
        Attn: Carl Blackstone, Attorney at Law

From:   Beverlee Kamerling

Re:     Legal Consultant to the Defense

Dear Mr. Blackstone:

Please be advised that I stated the content of this memorandum at a meeting at the FDC on April 6, 2009 with my attorneys of record, Mr. Robert Kondrat and FBI Agent Quinn. The verbal information provided contained, but was not limited to, the following:

(1) The written requests to Thomas Hillier, Attorney at Law and Supervisor of the Public Defenders Office, pursuant to the proposed legal consultancy and evaluation by Justin Sher, Attorney at Law, whose practice specializes in securities law and securities fraud. Mr. Sher is a former securities prosecutor.

(2) The various company clients in which I was continually instrumental in the discovery of securities violations and in the abiding of securities rules and regulations.

(3) My complaint to the Public Integrity Section of the Department of Justice, which is to be substantially expanded, further detailed and filed within the next few days.

As discussed with Mr. Kondrat, I contacted Mr. Thomas Hillier II, Attorney at Law, requesting permission for Justin Sher, Attorney at Law, New York, who specializes in securities law and civil and criminal securities fraud, to act as legal consultant to our defense. Mr. Sher is a former securities fraud prosecutor and would be retained to consult with Mr. Peter Avenia and Mr. Dennis Carroll, Attorneys at Law. Mr. Sher would assist my current defense attorneys in the settlement proposals and negotiations for myself and my son and co-defendant, Nicholas Alexander. Mr. Sher's knowledge and experience in securities and securities fraud far exceeds the knowledge and experience of any of the defense attorneys or the prosecuting attorneys.

This proposed legal consultancy was pursuant to the potential settlement and disposition of this case in a fair, just and equitable manner, an ambition that I had assumed would be the goal of any "justice" organization. I received written confirmation from the Federal Public Defenders office that they would not allow the legal consulting services of Justin Sher to act as securities

jurisconsult and defense negotiator pursuant to the disposition of this case. My business associates are willing to independently hire Justin Sher for a one-week period to attend the settlement conferences between myself, defense attorneys and the US Attorney's office. Mr. Robert Kondrat stated that it was the government's position that all negotiations would only be allowed to be conducted with the defense attorneys of record. The purpose of retaining Mr. Sher is to attempt to bring new and correct legal information concerning the charges and to provide legal knowledge and "insight" to justly evaluate and reasonably settle this case on the merits of the case, not to justify the funds expended by the government on an agency referral resulting in a misguided and over zealous investigation of this case. Heretofore, there has been no reasonable settlement negotiated by the public defenders office that was remotely acceptable to the defendants. In good conscience, we cannot plead to crimes we did not commit. Further, to continually wave the deliberate and ominous threat of 5 to 10 times potential prison sentences as a negotiating hammer to coerce pleas from defendants who assert their innocence and wish to pursue their right to trial, is the most significant and dangerous blight in American jurisprudence. This terror technique is promulgated and promoted by the government in each and every case and sometimes by certain defense lawyers for cases scheduled for trial throughout the federal court system. Reflectively, the government terror techniques defy the spirit of our Founding Fathers in their pursuit and creation of a fair and just government and legal system. In this case, the government has strongly suggested that we accept pleas to charges where we have declared our innocence. Would that not be perjury? We believe that the dynamics in using the same attorneys thus far and not bringing in a securities law and securities fraud attorney, even with the presence of an impartial federal judge (who also may have limited knowledge in securities law and securities fraud), will not result in any accepted disposition. This "Settlement Prevention Program" in the preclusion of a knowledgeable defense legal consultant could and would seriously impair our ability to achieve a "reasonable disposition" as part of our overall lack of ability to vigorously defend our case by being detained at a maximum security prison, without the ability to adequately access the government's discovery to prepare for trial. Such access to the government's discovery in any criminal case is the cornerstone of all legal criminal defense.

The defense will be better served and are entitled to the legal services of an "outside" securities attorney, particularly as we were violated on our Pretrial bond and returned to custody as an obvious government tactic to coerce plea bargains and impede the hiring of private, specialized legal counsel(s) for trial, capable of producing an acquittal for the defense. The record pursuant to our position of our illegal detainment may be accessed through my "Pro Se" filings to the court of "inadequate legal counsel" and my "Pro Se Appeal" to the 9th Circuit Court, which has been withdrawn. Even though the 9th Circuit Court Appeal has been withdrawn on the advice of now appointed legal counsel, the facts remain the same and are true and correct as contained in that 9th Circuit Court Appeal.

The Assistant US Attorney testified to many false statements to the court pertaining to the access to the government's discovery material(s) on disc by the defendants while incarcerated. The facts are that in the respective units occupied by both my son and co-defendant, Nicholas Alexander, and myself is that we share one computer that reads discovery discs with all of the other 120 inmates. That one computer, per unit, is shared by 120 inmates and is often not operational. Additionally, there is no printer connected to the discovery disc reader so that if there are discovery documents that have to be reviewed and researched, it is impossible to make copies to

2

research and to determine proper legal defense strategies. As there are over 10 gigabytes of discovery submitted by the government on disc, it would be virtually impossible for either myself or my son to view all of the discovery, the bulk of the discovery or even a portion of the discovery contained on the discovery discs prior to trial. We would not be able to print the subject discovery and adequately review and research the legal defenses pursuant to such discovery. Each inmate housing floor has 4 additional computers, dedicated solely to the service of email and not operational for any discovery disc reading. In addition to the sharing of the one discovery disc reader among 120 inmates, our inmate units are on "lock-down" for several hours per day where any access at all is prohibited. The government testified several times to the court that the housing units contained 5 computers and the facility provides easy access to those computers.

The government also testified that there is a law library accessible within the facility. That testimony is also grossly "mis-stated" to the court. There is no access to the Internet legal service, which is scheduled to be implemented next year. The inmate access to the law library is for 1 hour per week and 12 inmates per unit maximum. If there are 12 other inmates who signed up or who are permanently signed up, access to any of the meager law library reference materials is denied. The court believed the government's false testimony in the court's assessment of discovery access, which resulted in the decision to revoke our appearance bond. The government's false testimony, which is clearly untrue, was purposely misrepresented to the court as well as the untrue statements testified to by Pretrial Services for the specific purpose of bond revocation. The law provides that all defendants be allowed to mount a vigorous defense for trial. The situation of our incarceration at the Federal Detention Center does not come remotely close to allowing defendants to vigorously, adequately or minimally prepare for and defend themselves at trial.

The unjust governmental "hammers" have been used many times throughout this case. Pretrial Services has proven to be the sanctioned and conscripted investigatory arm of the prosecutors office and blatantly not "neutral" or "independent" as stated to the defendants and to the court. I am preparing a detailed complaint of governmental misconduct to the Public Integrity Section of the Department of Justice pursuant to this case, including the overt actions of Pretrial Services. A copy of that complaint will also be filed with the court for public record. Several factors to be contained in that complaint were verbally provided to both Mr. Kondrat and Mr. Quinn at the April 6, 2009 meeting.

One of those factors is that my son, Nicholas Alexander and I have joint defense agreements and have had such agreements in effect since January 2008. We are now scheduled to meet with the prosecutors and a federal judge in Tacoma, Washington, on April 23, 2009. Those joint defense agreements have not been implemented as my son and I have been purposely isolated and not allowed to confer pursuant to such legal joint defense agreements. My son has meet several times with the government pursuant to proposed (and unaccepted) interlocking plea agreements. In each and every instance of the scheduling of such meetings with the government, the request has been made for us to confer pursuant to our joint defense agreements and such requests have been summarily denied. We have been isolated and purposely denied the opportunity to confer with each other by the government. Further, my son has been denied any visitation for the entire term of his incarceration. To date, my son and I have been incarcerated unnecessarily and illegally for

7 months and have not been able to discuss or prepare to jointly defend our case. This denial of visitation and the ability to confer pursuant to our legal rights as set forth by our joint defense agreements is but one minor example of egregious government and procedural misconduct.

Additionally, I provided a summary of my continuing overall ethical and legal business conduct in my day-to-day activities prior to the indictment. Those activities included "whistle-blowing" on clients who attempted to avoid securities regulations and in the exposing of clients who actively violated securities rules and regulations. I provided a detailed report to both Mr. Kondrat and Mr. Quinn for their research and independent confirmation.

I sent Mr. Hillier three letters requesting that such a legal consultancy of Mr. Justin Sher be allowed and all three requests were denied. I then contacted Mr. James Henderson, Attorney at Law and defense attorney for Nicholas Alexander, to "contact Mr. Carl Blackstone of the US Attorney's office directly" and request that such a legal consultant be allowed to assist our defense in any and all settlement conferences. I did not receive an answer from Mr. Henderson and can only assume that he did not contact the US Attorney's office for permission to include the services of Mr. Justin Sher to evaluate and assist with this case.

As of this date, I am hereby requesting that Mr. Justin Sher, Attorney at Law, be allowed to assist defense attorneys in the settlement conference with the US Attorneys and federal judge on April 23, 2009, providing that this late date would be available to Mr. Sher. In the event that Mr. Sher is not available for that day, we request a new conference date be scheduled. To deny such request will most likely impede the implementation of any fair and just settlement to be proffered or enacted pursuant to the disposition of this case. As Mr. Sher will also be acting on behalf of an interlocking settlement agreement on behalf of Nicholas Alexander, I hereby also state that to deny such a request will impede the implementation of any fair and just settlement to be proffered or enacted pursuant to the disposition of the case pursuant to Nicholas Alexander.

Should you wish to visit with me personally with Mr. Kondrat and the defense attorneys regarding the above, please schedule that meeting with Mr. Peter Avenia or Mr. Dennis Carroll and I would be pleased to bring forward my concerns and examples of governmental misconduct, both prior to and after the issuing of the indictment. Thank you for your objective courtesy and consideration.

Respectfully,

/s/ Beverlee Kamerling